## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**TARA SNEARL ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 21-455-JWD-RLB**

**CITY OF PORT ALLEN, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Rule 12(c) Motion for Judgment on the Pleadings or, Alternatively, Rule 12(e) Motion for a More Definite Statement and Motion to Strike Pursuant to Rule 12(f)* (the "*Motion*") (Doc. 16) filed by defendants, the City of Port Allen, former Officer Briant Landry in his official capacity only, and former Officer Tiffeny Robertson Wycoskie in her official capacity only (collectively, the "Municipal Defendants"). Plaintiffs Tara Snearl and Ayana Tran (collectively, "Plaintiffs") oppose the *Motion*. (Doc. 25.) No reply was filed. Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Municipal Defendants' *Motion* is denied.

### I. Relevant Factual Background

#### A. Introduction

Fatrell Queen was the son of Plaintiff Tara Snearl ("Snearl") and the father of Plaintiff Ayanna Queen Tran. (*First Am. Pet. for Damages and Other Relief* ("*Am. Pet.*"), Preliminary Statement, Doc. 1-2 at 5.) Plaintiffs allege that, on November 2, 2017, an unknown person shot Queen in his home. (*Id.*) Soon thereafter, officers from the Port Allen Police Department ("PAPD"), including Briant Landry ("Landry") and Tiffeny Robertson Wycoskie ("Wycoskie"), along with deputies from the West Baton Rouge Sheriff's Office ("WBRSO"), arrived on the

scene. (*Id*. ¶ 10, Doc. 1-2 at 8.) According to the operative petition, Landry and/or Wycoskie shot Queen a second time, thereby killing him. (*Id*.) Plaintiffs maintain that Landry, Wycoskie, the City of Port Allen (the "City"), Sheriff Mike Cazes, and WBRSO, among others, have been attempting to cover up the purported actions of the officers that night. (*Id*., Doc. 1-2 at 8–9.)

### B. Specific Allegations Related to the Cover Up

#### *1. On the Day of Queen's Death*

Plaintiffs specifically allege that, on November 2, 2017, around 5:08 a.m., Landry and Wycoskie, among others, arrived at Queen's house after gunshots were heard at his house. (*Am. Pet.* ¶¶ 9–10, Doc. 1-2 at 8.) Plaintiffs plead, on information and belief, that one or both of these officers shot and killed Queen, and the City, Landry, Wycoskie, and others "have been attempting to conceal Landry's and/or Wycoskie's homicidal act since the date of Queen's death." (*Id.* ¶ 10, Doc. 1-2 at 8–9.)

Plaintiffs aver that PAPD and WBRSO officers provided a "different, deeply implausible, sequence of events[.]" (*Id.* ¶ 11, Doc. 1-2 at 9.) According to Plaintiffs:

> [These law enforcement officers] claim that, on November 2, 2017, at or about 5:19 a.m., Officers Landry and Wycoskie smelled gunpowder upon arriving at the scene, kicked in the front door of Queen's house, conducted a sweep of the house, and did not find Queen's body. This claim is highly implausible given the following: (a) By PAPD and WRBSO officers' own account, Queen's body lay in a pool of blood in his master-bedroom closet at the time, (b) Queen's one-story house is small, measuring only 1186 square feet, (c) the master-bedroom closet was shallow and had no door, (d) blood covered the closet floor and the bedroom wall, (e) there were several bullet holes visible in the closet wall, (f) there was a bullet hole in the front door, and (g) a former law enforcement officer later informed Petitioner Snearl that footage from a body camera on one of the officers who conducted the first sweep displayed Queen's hand hanging out of the open master bedroom closet.

(*Id.*)

Further, on the day of the incident around 5:21 a.m., the WBRSO officers cancelled a call to EMS in order "to prevent EMS workers from having access to Queen's body and the crime scene for fear of their learning the truth about how he died." (*Id.*)

Around 5:31 a.m., PAPD Office Kendra Wisham reached out to Snearl on Facebook Messenger, after which time Snearl drove to her son's home. (*Id.*)  Landry informed Snearl that Queen was "missing" and that Queen's "phone was 'pinging' in the area." (*Id.*)  Snearl owned Queen's house and wanted to enter, but the officers refused—then and for another twenty-four hours thereafter. (*Id.*)  Snearl started to walk around the neighborhood in a panic, and, during that time, Snearl was told to follow Officer Wisham's squad car to the local police station. (*Id.*)  Snearl complied and met Officer Wisham there. (*Id.*, Doc. 1-2 at 9–10.)  "Wisham kept . . . Snearl there for several hours." (*Id.*, Doc. 1-2 at 10.)

Later, around 6:30 a.m., a 911 recording reflects that Officer Wisham whispered to the dispatcher, "Don't tell her," and the dispatcher responded that Wisham should "tell her." (*Id.*)  Plaintiffs allege, on information and belief, that Officer Wisham "was instructing the dispatcher not to tell someone--either . . . Snearl or Queen's girlfriend Asia Guillar—that the police had located Queen's body." (*Id.*)

At or about 7:20 a.m. that day, or about two hours after the first sweep, two WBRSO officers named Carpenter and Barnett purportedly performed a second sweep of the home and "found Queen's body in the shallow master-bedroom closet." (*Id.*)

Later, around 10:00 a.m., or "at least 4.5 hours after Queen was killed and approximately 2.5 hours after Queen's body was allegedly found by WBRSO officers on the second sweep of Queen's house," Chief Deputy Corner Yancy Guerin was notified of Queen's death—not from a police officer but from a Port Allen Fire Department employee. (*Id.*)  This delay violated La. R.S.

13:5712(A), which requires that the coroner be notified "immediately" if someone has knowledge of a death under sudden or suspicious circumstances. (*Id.*)  Violation of this law is a misdemeanor offense. (*Id.*)  Plaintiff claims, on information and belief, that the Chief Deputy Coroner later filed a complaint with the Sheriff about his officers not notifying him, much less in a timely way, yet "no disciplinary action was ever taken." (*Id.*)

At or about 12:30 p.m. on the day of the incident, WBRSO Officer Doucet told Snearl "that Queen's body was found in the master-bedroom closet." (*Id.*)  Two hours later, "Snearl asked then-PAPD Chief Esdron Brown how his officers missed Queen's body on the first sweep." (*Id.*, Doc. 1-2 at 11.)  "Chief Brown offered no answer to this question."(*Id.*)

### *2. Since the Day of Queen's Death*

On June 12, 2019, an officer reached out to Snearl's daughter and asked her to have Snearl call him. (*Id.* ¶ 12, Doc. 1-2 at 11.)  Snearl did so, and the two met at a restaurant. (*Id.*)  "Because the officer was concerned that their conversation would be overheard, they moved to a more secluded location across the street." (*Id.*)  There, "the officer apologized to . . . Snearl for what happened on the day of Queen's death and offered the rationalization that police officers 'need to make split-second decisions.' " (*Id.*)  The *Amended Petition* states that the officer's comment implies that "[t]he responding PAPD officers, [Landry and Wycoskie], had shot and killed Queen." (*Id.* ¶ 12, Doc. 1-2 at 11.)

On November 12, 2017, the Chief Deputy Coroner Guerin told Snearl that "Queen had been shot four times and that the fatal gunshot had been fired at close range downward through the forehead at the base of [his] skull." (*Id.*)

Plaintiffs then allege other misconduct by the PAPD and WBRSO officers purporting to show that "[t]hey were not trying to investigate Queen's homicide but rather [were] . . . trying to

4

suppress the homicide investigation and thereby enable PAPD Officers Landry and/or Wycoskie as well as PAPD itself to escape legal consequences for killing Queen." (*Am. Pet.* ¶ 14, Doc. 1-2 at 11–12.)  Such misconduct includes:

(1) "PAPD was named as the lead agency in the investigation of Queen's death, even though, at the time, PAPD did not have any officer who was qualified." (*Id.*, Doc. 1-2 at 12.)  Officer Wisham was originally designated as lead investigator, but he had not completed the requisite homicide investigator training. (*Id.*)  WBRSO Officers Kevin Cyrus and Kenneth Young were both qualified, but they refused. (*Id.*)  According to Plaintiffs, the fact that the investigation was spearhead by "unqualified personnel" has led her to the inference that "the investigation . . . was not being, and would not be, taken seriously." (*Id.*)  Snearl claims that, after over three and a half years, her "suspicion has been vindicated." (*Id.*)

(2) Queen's car was towed to WBRSO, "even though the vehicle was not part of the crime scene." (*Id.*).  WBRSO Officer Ron LeJeune justified the towing by saying, "without any basis, that they believed a body was in the trunk." (*Id.*)

(3) On October 22, 2020, Wycoskie told Snearl's Private Investigator ("PI") Jerry Summers that, on the day of Queen's death, her husband, Bryan "Deuce" Wycoskie, used his personal power tools to extract bullet casings from Queen's master bedroom closet." (*Id.*)

(4) "Wycoskie and the remaining officers selectively collected some, but not all, evidence from the crime scene, leaving behind <u>significant</u> ballistic evidence," including:

(a) a 40mm. casing found in Queen's master-bedroom closet on November 3, 2017, by Queen's family;

(b) a bullet casing found on a coffee table in Queen's living room by PI Summers on June 20, 2020;

(c) a bullet fragment found in Queen's master-bedroom closet and a bullet found in the wood frame of a house across the street on June 30, 2020, by PI Summers. It must be noted that (i) Chief Brown was told about this bullet but did not try to retrieve it at any time since Queen's killing, and (ii) PI "Summers asked Officer Wisham about her failure to retrieve this evidence," and "she responded only that she had been aware of it," and

(d) a bullet fragment found in the vinyl siding at a different house adjacent to Queen's by PI Summers on July 2, 2020.

(*Am. Pet.* ¶ 14, Doc. 1-2 at 12–13.)

Additionally, on August 20, 2020, PI "Summers applied Luminal spray at the crime scene to identify the locations of blood spatter from Queen's body." (*Id.*, Doc. 1-2 at 13.)  The PI found (and recorded by video) "that the blood splatter was more extensive and widespread in Queen's bedroom than WBRSO and PAPD had indicated, and that at least one individual had tried to clean it up."  (*Id.*)  Plaintiffs allege, on information and belief, that these officers attempted "to scrub Queen's blood from the crime scene, including Queen's bed, to conceal the location where Landry and/or Wycoskie initially found, shot, and killed Queen." (*Id.*)

On April 28, 2021, PI Summers found through a public records request that, as of June 17, 2020, the PAPD Firearms Inventory had been updated and that Landry and Wycoskie's weapons were missing from that inventory. (*Id.*)  Plaintiffs allege on information and belief that these weapons were used to shoot and kill Queen. (*Id.*)  "The absence or removal of these two officers' weapons from the Firearms Inventory is perfectly consistent with all the other efforts by PAPD officers to conceal what occurred at Queen's house that morning." (*Id.*)

Plaintiffs also plead that, as of the filing of the *Amended Petition*, PAPD have refused— over three and a half years following Queen's death—to give Snearl any information concerning their investigation. (*Id.* ¶ 15, Doc. 1-2 at 14.)  Snearl has asked numerous times for the police report, but PAPD has not followed through on its promises to give her a copy, and they have not allowed her to see video from the responding officers' body cameras or the surrounding buildings' surveillance cameras. (*Id.*)  On February 26 and March 19, 2021, Snearl met with the PAPD Chief to talk about the investigation, and, both times, the Chief indicated that he had not reviewed the police report or body camera videos or discussed the case with the district attorney. (*Id.*)

Plaintiffs claim that, because of Queen's death and the subsequent cover up and stonewalling, Snearl has suffered from "high blood pressure, anxiety, depression, headaches, insomnia, weight gain, and bad dreams." (*Id.* ¶ 16, Doc. 1-2 at 14.)  She also "has received, and continues to receive, medical and psychiatric treatment." (*Id.*)

### C. Procedural History

In the *Amended Petition,* Plaintiffs assert the following claims:

(1) "survival and wrongful death based on battery or negligent killing" against Landry and Wycoskie, (*Am. Pet.* ¶ 19, Doc. 1-2 at 15);

(2) a claim under 42 U.S.C. § 1983 for excessive force in violation of the Fifth and Fourteenth Amendments against Landry and Wycoskie, (*id.*);

(3) intentional infliction of emotional distress ("IIED") and, alternatively, negligent infliction of emotional distress ("NIED") against Landry and Wycoskie for killing Queen, (*id.* ¶ 20, Doc. 1-2 at 16);

(4) IIED against Landry, Wycoskie, and others, for refusing to admit to Queen's killing and their continued attempt to conceal that they killed Queen, (*id.* ¶ 21, Doc. 1-2 at 16);

(5) conspiracy to commit IIED against Landry, Wycoskie, and others, for the above conduct, (*id.* ¶ 22, Doc. 1-2 at 17);

(6) fraud against Landry, Wycoskie, and others for their preventing Snearl from learning that Landry and Wycoskie killed Queen and suppressing the truth regarding same "in order to obtain an unjust advantage to themselves—specifically, avoidance of legal exposure, financial expense, and reputational damage," (*id.* ¶ 23, Doc. 1-2 at 17);

(7) conspiracy to commit fraud against Landry, Wycoskie, and others, for the above conduct, (*id.* ¶ 24, Doc. 1-2 at 17);

(8)  respondeat superior against the City, *inter alia*, (*id.* ¶ 25, Doc. 1-2 at 18); and

(9) claims against unknown insurers, (*id.* ¶ 26, Doc. 1-2 at 18).

On March 15, 2022, this Court issued a Ruling and Order, (Doc. 32), on a motion to dismiss filed by Sheriff Cazes and the WBRSO ("Sheriff Defendants"), (Doc. 14).  The Court granted that motion in full, dismissed all claims by Plaintiffs against the Sheriff Defendants, but gave Plaintiffs

leave to amend their pleading to cure the deficiencies. (Doc. 32 at 27.)  In that ruling, the Court provided many standards and addressed several issues that will be relevant to the instant motion. Those standards and issues will be provided (or at least summarized) below.

On September 24, 2021, the Municipal Defendants filed the instant *Motion*. (Doc. 16.) These defendants move (1) for judgment on the pleadings under Federal Rule of Civil Procedure ("Rule") 12(c), dismissing Plaintiffs' state law claims against the City, Landry, and Wycoskie (the latter two in their official capacity only), essentially for failure to state a claim; or (2) alternatively, for a more definite statement under Rule 12(e), and for a motion to strike scandalous statements under Rule 12(f). (*Id.* at 1.)

## II.    Motion for Judgment on the Pleadings

### A.  Relevant Standards

#### *1. Rule 12(c) Standard*

Rule 12(c) provides that, after the pleadings are closed but early enough not to delay trial, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). A Rule 12(c) motion is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam) (citing 5A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1367, at 509–10 (1990)).

The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6). *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002)).  With respect to these motions, the Supreme Court has explained, "Federal

pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled

to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect

statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135

S. Ct. 346, 346–47 (2014).

Interpreting Rule 8(a), the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter
> (taken as true) (3) to raise a reasonable hope or expectation (4) that
> discovery will reveal relevant evidence of each element of a claim.
> "Asking for [such] plausible grounds to infer [the element of a
> claim] *does not impose a probability requirement* at the pleading
> stage; it simply calls for enough facts to raise a reasonable
> expectation that discovery will reveal [that the elements of the claim
> existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007) (emphasis added in *Lormand*)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to
> conclusions, factual allegations remain so entitled. Once those
> factual allegations are identified, drawing on the court's judicial
> experience and common sense, the analysis is whether those facts,
> which need not be detailed or specific, allow "the court to draw the
> reasonable inference that the defendant is liable for the misconduct
> alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ]; *Twombly*,
> [550] U.S. at 556. . . . This analysis is not substantively different
> from that set forth in *Lormand, supra*, nor does this jurisprudence
> foreclose the option that discovery must be undertaken in order to
> raise relevant information to support an element of the claim. The
> standard, under the specific language of Fed. R. Civ. P. 8(a)(2),
> remains that the defendant be given adequate notice of the claim and
> the grounds upon which it is based. The standard is met by the
> "reasonable inference" the court must make that, with or without
> discovery, the facts set forth a plausible claim for relief under a
> particular theory of law provided that there is a "reasonable
> expectation" that "discovery will reveal relevant evidence of each
> element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, [550]
> U.S. at 556. . . .

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

Thus, "[i]t is axiomatic, as it is for motions under Rule 12(b)(6) and as evidenced by countless judicial opinions . . . , that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." 5C A. Benjamin Spencer, *Federal Practice & Procedure (Wright & Miller)* § 1368 (3d ed. 2021). "Thus, in effect, the party opposing the motion has the benefit of all possible favorable assumptions." *Id.*; *see also Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014) (stating that, in deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff).

### 2. Rule 9(b) Standard

"Generally, a plaintiff's complaint will survive a Federal Rule of Civil Procedure 12(b)(6) [or Rule 12(c)] motion to dismiss if the complaint plausibly states a claim for relief, assuming its factual allegations are true." *Turner v. Ascendium Educ. Grp.*, No. 20-660, 2021 WL 5510232, at *6 (M.D. La. Nov. 24, 2021) (deGravelles, J.) (quoting *Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc.*, No. 17-592, 2018 WL 3748399, at *5 (M.D. La. Aug. 7, 2018) (deGravelles, J.) (citing *Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (citing *Ashcroft*, 556 U.S. at 678)). "However, when the complaint involves a fraud allegation, [Rule] 9(b) requires a higher pleading standard." *Id.* Specifically, this pleading standard requires the plaintiff to "state with particularity the circumstances constituting fraud." *Id.* (citing Fed. R. Civ. P. 9(b)).

"The Fifth Circuit has interpreted [Rule] 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.* (quoting *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)) (cleaned up). "In short, plaintiffs must plead enough facts to illustrate 'the who, what, when, where, why and how' of the alleged fraud." *Schott, Tr. for Est. of InforMD, LLC v. Massengale*, No. 18-759, 2019 WL 4741811, at *12 (M.D. La. Sept. 27, 2019) (deGravelles, J.) (quoting *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005)).  "The Fifth Circuit ' "appl[ies] Rule 9(b) to fraud complaints with bite and without apology." ' " *United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. 18-312, 2022 WL 879492, at *4 (M.D. La. Mar. 23, 2022) (deGravelles, J.) (quoting *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (unpublished) (quoting *United States rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009)), *cert. denied*, 141 S. Ct. 1238 (2021)).

Further, though there is no heightened pleading requirement under *§ 1983* for claims against municipalities and public officers in their official capacity, *see Jordan v. Gautreaux*, --- F. Supp. 3d ----, No. 21-48, 2022 WL 895720, at *11 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (quoting *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)), this Court previously determined in ruling on the Sheriff Defendants' motion that *Leatherman*'s rule does *not* apply to state law fraud claims, *see* Doc. 32 at 7–8 (citing *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, 759 F. App'x. 280, 289 (5th Cir. 2019) ("State law fraud claims are subject to the heightened pleading requirements of Rule 9(b).") (citations omitted)).  Likewise, Plaintiffs' state law claims against Landry and Wycoskie for fraud and conspiracy to commit fraud are subject to Rule 9(b).

Finally, "[w]hile fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *Byrd*, 2022 WL 879492, at *29 (quoting *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005)); *see also United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 723 (5th Cir. 2008) (unreported) (stating that, even when this "relaxed standard" applies, "[p]leading on information and belief does not otherwise relieve a qui tam plaintiff from the requirements of Rule 9(b)." (citing, *inter alia*, *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." (internal quotations and citation omitted)))).

### B.  Fraud and Conspiracy to Commit Fraud Claims

#### 1. Parties' Arguments

Municipal Defendants argue that Plaintiff's allegations against them are "brief, nebulous, non-specific and, frankly, outrageous and unsubstantiated[.]" (Doc. 16-1 at 5.)   Municipal Defendants then summarize some of the allegations against them. (*Id.* at 6.)  These defendants then say that it is unclear whether Plaintiffs allege that the defendants made misrepresentations of fact or, alternatively, that they are simply not sharing key information about Queen's death. (*Id.*)  According to Municipal Defendants, "Plaintiffs' allegations fail to meet the particularity requirement listed in Rule 9(b) in almost every respect." (*Id.* at 7.)  These defendants say that Plaintiffs have not alleged (1) that these defendants made misrepresentations; (2) when or where such misrepresentations occurred; (3) what the content of same was; and (4) how it was communicated. (*Id.*)  If Plaintiffs claim that Municipal Defendants have refused to divulge key

information, they have not alleged when they obtained the information, who provided it to them, and when they failed to divulge the information. (*Id.*)  All defendants are lumped together, and this is insufficient to pass Rule 9(b) muster. (*Id.*)

Plaintiffs respond that a conspiracy can be pled through circumstantial evidence, including overt acts done in furtherance of the conspiracy. (Doc. 25 at 7.)  Further, Plaintiffs argue that they need not meet a heightened pleading requirement for official capacity claims, though, as explained above, this Court has rejected that argument.  (*Id.*)  Additionally, Plaintiffs have primarily relied upon fraudulent *conduct*, not statements, and Plaintiffs provide examples of these from the operative petition. (*Id.* at 7–8.)  Moreover, to the extent Plaintiffs rely on fraudulent statements, they provide the who, what, when, where, and how of same. (*Id.* at 8.)  Plaintiffs have also sufficiently alleged that all of the Municipal Defendants were part of the conspiracy, and, to the extent they didn't, Plaintiffs request leave to amend to do so. (*Id.* at 8 & n.5.)  Any failure to properly allege the conspiracy is the result of these defendants' own conduct, and Plaintiffs need not plead fraud with particularity if the information is within the exclusive control of defendants. (*Id.* at 9.)  "Given the opaque nature of conspiracies and the permissibility of pleading them through a combination of circumstantial evidence, the complaint easily meets the threshold for alleging a conspiracy to defraud." (*Id.* at 10.)

### 2. Applicable Law

Under Louisiana law, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. Civ. Code art. 1953. "The elements of a claim for fraud include: (1) a misstatement or omission, (2) of material fact, (3) made with the intent to defraud, (4) on which the plaintiff relied, and (5) which proximately caused the plaintiff's injury." *Berry v.*

*LoanCity*, 489 F. Supp. 3d 441, 453 (M.D. La. 2020) (deGravelles, J.) (quoting *Bradford v. Law Firm of Gauthier Houghtaling & Williams, LLP*, No. 13-2407, 2013 WL 6279687, at *4 (E.D. La. Dec. 4, 2013) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)), *appeal dismissed sub nom. Berry v. Wells Fargo Bank, N.A.*, 833 F. App'x 600 (5th Cir. 2021)); *see also Wilson v. GMFS LLC*, No. 18-840, 2019 WL 8301667, at *5 (M.D. La. May 24, 2019) ("To establish fraud, Plaintiff was required to allege that there was a misrepresentation of a material fact, made with the intent to deceive, which caused justifiable reliance with resultant injury.") (citing *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999)). "[F]raud may result . . . from an act, such as a false assertion or suppression of the truth[.]" La. Civ. Code art. 1953, cmt. (b).

"Fraud may also result from silence or inaction." La. Civ. Code Ann. art. 1953. "[U]nder Louisiana law, claims of fraud by silence or omission first require a duty to disclose." *Schott, Tr. for Est. of InforMD, LLC v. Massengale*, No. 18-759, 2019 WL 4741811, at *13 (M.D. La. Sept. 27, 2019) (deGravelles, J.). "Louisiana courts tend to recognize a duty to speak in situations where the 'failure to disclose would violate a standard requiring conformity to what the ordinary ethical person would have disclosed.' " *Id.* (quoting *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc*., 178 F. Supp. 3d 390, 401 (E.D. La. 2016) (quoting *Bunge Corp. v. GATX Corp*., 557 So. 2d 1376, 1383 (La. 1990))).

Additionally, "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. Civ. Code art. 2324. "The Louisiana Supreme Court has explained that Article 2324 'does not by itself impose liability for a civil conspiracy,' for ' "[t]he actionable element in a claim under this Article is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which

14

they actually commit in whole or in part.' " *Barbe v. Ocwen Loan Servicing, LLC*, 383 F. Supp. 3d 634, 645 (E.D. La. 2019) (quoting *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002) (quoting *Butz v. Lynch*, 710 So. 2d 1171, 1174 (La. App. 1 Cir. 1998))). "In other words, a civil conspiracy is simply a means to impute liability for an underlying tort." *Id.* (citing *Ross*, 828 So. 2d at 552). "To establish the existence of a civil conspiracy, a plaintiff must show that 'an agreement existed to commit an illegal or tortious act, which act was actually committed, which resulted in the plaintiff's injury, and there was an agreement as to the intended outcome or result.' " *Id.* (quoting *Curole v. Delcambre*, 224 So. 3d 1074, 1082 (La. App. 3 Cir. 2017).

### 3. Analysis

Having carefully considered the matter, the Court will deny the *Motion* on these claims. In short, Plaintiffs have alleged sufficient facts from which the inference can be drawn that Landry and Wycoskie committed fraud and conspired to perpetrate same.

The Court need not repeat the detailed paragraphs of the *Amended Petition* summarized above, but a reading of this pleading as a whole (as well as these allegations in particular) demonstrates that Plaintiffs have satisfied Rule 9(b)'s requirements. The operative petition specifically alleges how Landry and Wycoskie shot and killed Queen and how these officers and others "have been attempting to conceal Landry's and/or Wycoskie's homicidal act since the date of Queen's death." (*Am. Pet.* ¶ 10, Doc. 1-2 at 8–9.)

The *Amended Petition*'s Preliminary Statement summarizes the numerous actions taken by officers to perpetrate this fraud, including:

(1) implausibly claiming not to find Queen's body during the sweep, despite the layout of the house, the bullet holes in the walls, and the purported body-cam footage showing otherwise;

(2) cancelling an officer's previous request for an ambulance at the crime scene;

(3) claiming to find Queen's body two hours after the initial sweep;

(4) unreasonably and unlawfully failing to contact the West Baton Rouge Corner's Office until four and a half hours after Queen was killed, with said contact coming from a Port Allen Fire Department employee;

(5) curiously towing Queen's car to WBRSO without a believable justification;

(6) failing to have a qualified officer lead the investigation into Queen's death; and

(7) "selectively collect[ing] certain pieces of ballistics evidence from the crime scene while leaving behind others." (*Id.*, Doc. 1-2 at 6.)

All paragraphs after the Preliminary Statement give additional details, providing the who, what, when, where, and how of these claims. (*See Am. Compl.* ¶¶ 11–15, Doc. 1-2 at 9–14.) Dates, names, and locations are used, and specifics are given as to how the fraud was perpetrated. (*See id.*)

Different paragraphs highlight other supposed acts showing the officers' suppression of truth. These include

(8) the suspicious 911 call with the instruction, "Don't tell her," (*id.*, Doc. 1-2 at 10);

(9) Wycoskie's husband using power tools to extract bullet casings from Queen's closet, (*id.*, Doc. 1-2 at 12);

10) the results of PI Summer's Luminal spray, which showed that "the blood spatter was more extensive and widespread in Queen's bedroom than WBRSO and PAPD had indicated" and that "at least one individual had tried to clean it up," (*Id.*, Doc. 1-2 at 13);

11) Landry and Wycoskie's firearm's being missing from the PAPD Firearms Inventory, (*id.*); and

12) Snearl's meeting with the PAPD Chief Hicks, who indicated that he had not reviewed the police report or body-cam footage or discussed the case with Tony Clayton, (*id.* ¶ 15, Doc. 1-2 at 14).

Again, all of these paragraphs provide considerable specifics as to the time, place, and persons involved.

The Court finds that, even considering the heightened pleading requirements of Rule 9(b), Plaintiffs easily allege the " 'who, what, when, where, why and how' of the alleged fraud." *See Byrd,* 2022 WL 879492, at *29 (applying through fraud analysis). Phrased another way, the Court can easily infer from the above facts, accepted as true and construed in a light most favorable to Plaintiffs, that Landry and Wycoskie killed Queen and then suppressed the truth about that murder through acts and silence—both of which support a finding of fraud under these circumstances, *see* La. Civ. Code art. 1953, cmt. (b); *Schott,* 2019 WL 4741811, at *13—with the specific intent to defraud Plaintiffs (and indeed, the community), to escape liability, which Plaintiffs were then forced to rely upon, and which caused them significant emotional distress, *see Berry*, 489 F. Supp. 3d at 453. Further, the Court can easily infer from such circumstantial evidence of coordinated conduct an agreement to accomplish this fraud, which, again, was actually committed and which in fact caused Plaintiffs significant injuries. *See Barbe*, 383 F. Supp. 3d at 645.

Some of Plaintiffs' allegations are made "on information and belief." As stated above, "[w]hile fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *Williams*, 417 F.3d at 454. But, here, Plaintiffs provide that factual basis: their own named private investigator and statements by specifically identified law enforcement officers. *See Byrd,* 2022 WL 879492, at *29.

Municipal Defendants also complain that all officers are lumped together without distinction. While that may be true in the Preliminary Statement, as stated above, specific names are listed throughout the *Amended Petition* to put muscle on the bones of that introduction.

Further, Landry and Wycoskie's conduct in the alleged fraud and conspiracy is equally clear. According to Plaintiffs, Landry and Wycoskie killed Queen, a fact which is supported by

17

all the circumstantial evidence throughout the *Amended Petition*, including the blood splatter analysis and their firearms being missing from the PAPD Firearms inventory. (*Am. Pet.* ¶¶ 10, 14, Doc. 1-2 at 8, 13.)  Plaintiffs also provide the "sequence of events" of how Landry and Wycoskie "smelled gunpowder upon arriving at the scene, kicked in the front door of Queen's house, conducted a sweep of the house, and did not find the body," (*Am. Pet.* ¶ 11, Doc. 1-2 at 9), and Plaintiffs specifically explain why this story is "deeply implausible," (*id.*).  Landry tells Snearl upon her arrival at the home that her son is "missing," which was purportedly not the case, (*id.*), and PI Summers later learns that Wycoskie's husband "used his personal power tools to extract bullet casings from Queen's master bedroom," (*id.* ¶ 14, Doc. 1-2 at 11–12).  Plaintiffs also plead how Wycoskie and the other officers on the scene "selectively collected some, but not all, evidence from the crime scene, leaving behind significant ballistic evidence." (*Id.* at 12.)  In short, Municipal Defendants' arguments on this issue are borderline frivolous.

To summarize, the Court finds, looking at the allegations of the *Amended Complaint* specifically and as a whole, and drawing reasonable inferences in Plaintiffs' favor, that Plaintiffs have easily stated viable claims of fraud and conspiracy to commit fraud against Landry and Wycoskie and passed Rule 9(b) muster.  Consequently, the *Motion* will be denied for these claims.

**C.  IIED and Conspiracy to Commit IIED**

*1. Parties' Arguments*

Municipal Defendants next move to dismiss the IIED and conspiracy to commit IIED claims. (Doc. 16-1 at 7–8)  These defendants contend, "Plaintiffs do not state with any particularity what Defendants allegedly did to prevent Tara Snearl from learning what she alleges to be the truth or how Defendants came to learn this alleged truth. Instead, Plaintiffs seem satisfied to fashion another generic, conclusory allegation against Defendants." (*Id.* at 8.)  Municipal Defendants

maintain that Plaintiffs must pass Rule 9(b) muster because of the interconnectedness of the fraud and IIED claims, but Plaintiffs fail to do so. (*Id.* at 8–9.)

Plaintiffs respond that they plead two IIED claims: one based on Landry and Wycoskie murdering Queen, and the other "predicated on the year-long cover up." (Doc. 25 at 10.)  "As to the first, it is difficult to imagine conduct more extreme and outrageous than the unjustified killing of another; it is equally obvious that anyone who shoots another person to death would be certain that doing so would cause the decedent's mother severe emotional distress." (*Id.* (citation omitted).)  Further, "[i]t is equally clear that a police cover-up can give rise to an IIED claim." (*Id.* at 10–11 (citations omitted).)  According to Plaintiffs, Municipal Defendants only contend that Plaintiffs have not satisfied Rule 9(b), but this does not apply to official capacity or fraud claims.

### *2. Law and Analysis*

To state a cause of action for IIED, a plaintiff must plead the following elements: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *Sparks v. Donovan*, 04-388 (La. App. 3d Cir. 10/13/04), 884 So. 2d 1276, 1282 (quoting *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991)). The conduct complained of "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *White*, 585 So. 2d at 1209. "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like." *Id.* at 1210. "Conduct which is merely tortious or illegal does not rise to the

level of being extreme and outrageous." *Nicholas v. Allstate Ins. Co.*, 99-2522 (La. 2000), 765 So. 2d 1017, 1025.

Having carefully considered the matter, the Court will deny the *Motion* on these issues. There is little doubt for the Court that murder and a subsequent cover up is the type of extreme, outrageous behavior that would cause severe emotional distress so as to satisfy the requirements of an IIED claim, and Municipal Defendants do not appear to dispute this.  Rather, as Plaintiffs contend, the Municipal Defendants take the position that Plaintiffs have not pled, with Rule 9(b) particularity, that these particular defendants engaged in such conduct.

This Court previously determined with respect to the Sheriff that Rule 9(b) applies to Plaintiffs' IIED and NIED claims because "Plaintiffs' allegations of fraud are essentially identical to those of their IIED claims." (Doc. 32 at 20; *see also id.* at 15–20 (citing, *inter alia*, *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103 (5th Cir. 2019) (finding that Rule 9(b) did not apply to negligent misrepresentation claim because it "relie[d] on a different set of misrepresentations . . . than its fraudulent transfer claims" and because the "two claims also rely on different sets of underlying facts"); 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1297 (4th ed. 2021); *Depot, Inc. v. Caring for Montanans, Inc*., 915 F.3d 643, 668 (9th Cir. 2019) ("[B]ecause plaintiffs rely on a 'unified course of fraudulent conduct' as the basis of the constructive fraud claim, the claim is at a minimum 'grounded in fraud' and therefore 'must satisfy the particularity requirement of Rule 9(b).' "); *Bynane v. Bank of N.Y. Mellon for CWMBS*, 866 F.3d 351, 360–61 (5th Cir. 2017) ("stating that an allegation of a forged signature must meet the pleading requirements of Rule 9(b)"); *Gibson v. Credit Suisse AG*, 787 F. Supp. 2d 1123, 1135-1136 (D. Idaho 2011) ("holding that a negligence claim was subject to Rule 9(b) because all other claims

were grounded in fraudulent conduct and the negligence section of complaint did nothing but incorporate allegations of other sections")).

But, with respect to the Municipal Defendants, the Court need not even make that determination.  Even assuming that Rule 9(b) did apply to the IIED and conspiracy to commit IIED claims, Plaintiffs have easily met that standard.  For all of the reasons given above with respect to the fraud claims, the Court finds that Plaintiffs have adequately pled that Landry and Wycoskie murdered Queen and conspired with others to suppress the truth of that murder. This constitutes IIED and conspiracy to commit same.  Consequently, the *Motion* will be denied with respect to these claims.

### III.    Motion for More Definite Statement

#### A.  Parties' Arguments

Municipal Defendants next move in the alternative for a more definite statement. (Doc. 16-1 at 9.)  They claim that the *Amended Petition* frequently refers to officers generically without identifying whether the employee worked for the PAPD or the WBRSO. (*Id.*)  These defendants also quote the Preliminary Statement as an example of lack of specificity. (*Id.* at 10.)  Plaintiffs do not allege which officers were present at the scene when Queen was allegedly shot, and this information is crucial. (*Id.*)  Municipal Defendants say that "they should not be forced to engage in unnecessary discovery to learn facts which should be apparent on the face of Plaintiffs' *Amended Petition*." (*Id.* at 11.)

Plaintiffs call Municipal Defendants' position "meritless." (Doc. 25 at 11.)  They say that the "Preliminary Statement is just that—an introduction.  If the Municipal Defendants had taken time to read the remainder of the complaint, it very clearly specifies names, dates, statements, and describes events in detail where such information is ascertainable without discovery." (*Id.*)  Any

deficiency is, for Plaintiffs, the fault of Municipal Defendants, "who have refused at every turn to supply any information to Ms. Snearl about the events of November 2, 2017." (*Id.*)  Plaintiffs say that Municipal Defendants' argument that the *Amended Petition* fails to name specific officers is "[e]qually disingenuous." (*Id.*) To Plaintiffs, it is "risible" that they would be required to identify for Municipal Defendants which officers were on the scene when these defendants have access to that information. (*Id.* at 11–12.)

### B.  Rule 12(e) Standard

Rule 12(e) provides that "a party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e); *see also Beanel v. Freeport–McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999) ("If a complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed, the proper remedy is a motion for a more definite statement under Rule 12(e)"). The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). A Rule 12(e) motion may be appropriate "if a pleading fails to specify the allegations in a manner that provides sufficient notice." *Id.* at 514.

When evaluating a motion for a more definite statement, the Court must assess the complaint in light of the minimal pleading requirements of Rule 8. *Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*, 235 F.R.D. 632, 633 (E.D. La. 2006); *see* Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief"). Given the liberal pleading standard set forth in Rule 8(a), Rule 12(e) motions are disfavored. *Adams v. Southland Trace*, No. 07-869, 2012 WL 12986191, at *5 (M.D. La. Feb. 29, 2012). The trial judge is given considerable discretion in deciding whether to grant a Rule 12(e)

motion. *Id.* Finally, a Rule 12(e) motion is not a substitute for the discovery process. *Ford v. Cain*,

No. 15-136, 2016 WL 447617, at *2 (M.D. La. Feb. 4, 2016).

"There are, however, two contexts in which a relatively liberal approach to the granting of

Rule 12(e) motions seems appropriate," and the first of these is "when the request for a more

definite statement is used to enforce the special pleading requirements of Rule 9(b)[.]" 5C Arthur

R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure (Wright & Miller)* § 1376 (3d

ed. 2022). "Even though Rule 9 itself contains no mechanism for enforcing its terms, numerous

cases make it clear that the common practice has been to use a motion under Rule 12(e) for that

purpose." *Id.*

> When a claim based on fraud . . . is sufficiently definite that the
> pleader can prepare a responsive pleading but not sufficiently
> particularized to satisfy the requirements of Rule 9(b), however,
> there is some theoretical difficulty in granting relief under Rule
> 12(e) inasmuch as that provision's language appears to prohibit that
> course of action. . . . [S]ome courts have overcome this obstacle and
> sought to correct a failure to meet the particularity standards of Rule
> 9 by granting a motion under Rule 12(b)(6), Rule 12(e), or Rule
> 12(f).

*Id.* But Wright & Miller counsels:

> Rather than distorting the motion for a more definite statement to
> secure supplementation of an insufficiently particular allegation of
> fraud or mistake, it seems more appropriate to enforce Rule 9(b) by
> dismissing the challenged pleading or striking deficient allegations.
> This approach eliminates any need to distort the application of the
> motion for a more definite statement and, at the same time, ensures
> that the objectives of the special pleading rule in Rule 9(b) are
> achieved. Also, unlike the Rule 12(e) motion, the sanctions of
> dismissal or striking the pleading or a portion of a pleading can be
> employed when the claim of fraud is made in a pleading to which
> no responsive pleading is permitted. In a sense, therefore, the
> suggested procedure provides the district judge with more flexible
> tools.

5A Benjamin Spencer, *Federal Practice and Procedure (Wright & Miller)* § 1300 (4th ed. 2022).

### C.  Analysis

Having carefully considered the matter, the Court will deny the *Motion* on this issue. Here, Municipal Defendants' arguments are, at best, weak; as Plaintiffs say, the Preliminary Statement is a mere introduction which is later supplemented with specific names, dates, and places.  Further, it is disingenuous for these defendants to claim that the operative pleading does not "give the defendant fair notice of what the plaintiffs['] claim[s] [are] and the grounds upon which it rests," *Swierkiewicz*, 534 U.S. at 512, particularly with respect to which officers were involved, when (1) Plaintiffs expressly list many officer names, and (2) these defendants would certainly have access to that information.  For all of the reasons given above, the Court finds that the *Amended Petition* is not "so vague or ambiguous that the party cannot reasonably prepare a response," Fed. R. Civ. P. 12(e), so Municipal Defendants' motion for a more definite statement is denied.

### IV.  Motion to Strike

### A.  Parties' Arguments

Municipal Defendants close by arguing that the Court strike the "scandalous accusations made against them in plaintiff's complaint pursuant to [Rule] 12(f)[.]" (Doc. 16-1 at 11.)  These defendants specifically reference paragraphs 10, 12, 14, 16, 19, 20, 21, 23, and 24 as particularly scandalous because they accuse Officers Landry and Wycoskie of homicide "which [allegations] are vehemently denied and should be stricken from the pleadings." (*Id.*)

Plaintiffs emphasize that Rule 12(f) motions are disfavored and infrequently granted. (Doc. 25 at 12 (citations omitted).)  Further, allegations of wrongdoing are not per se strikable. (*Id.* (citations omitted).)  The above allegations are "the very basis of Plaintiffs' lawsuit and therefore entirely necessary." (*Id.* at 12.)  Plaintiffs conclude:

> Plaintiffs have pled numerous facts from which this court may
> reasonably infer that Officers Landry and/or Wycoskie wrongfully
> killed Queen. . . . These allegations, which must be treated as true at
> the pleading stage, are more than sufficient to survive any pleading
> challenge under Rule 12. If Officers Landry and Wycoskie find
> these allegations outrageous, they will have ample time during and
> after to make their case. In the meantime, this Court should reject
> Municipal Defendants' transparently improper invocation of Rule
> 12(f).

(Doc. 25 at 13.)

### B. Rule 12(f) Standard

Federal Rule of Civil Procedure 12(f) provides in relevant part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter." 5C Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* (*Wright & Miller)* § 1382 (3d ed. 2022). *See also United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (stating that the Fifth Circuit "review[s] a district court's ruling on a motion to strike for abuse of discretion.").

A party urging a motion to strike must meet certain requirements. "[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy[.]" *Coney*, 689 F.3d at 379 (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962)); *see also Gilchrist v. Schlumberger Tech. Corp.*, 321 F.R.D. 300, 302 (W.D. Tex. 2017) (citing *Coney*, 689 F.3d at 379). Further, the mover must show that the "presence [of the challenged allegations] in the pleading throughout the proceeding will be prejudicial[.]" *F.D.I.C. v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (citing *Augustus*, 306 F.2d at 868); *see also Global Adr, Inc. v. City of Hammond*, No. 03-457, 2003 WL 21146696, at *1 (E.D. La. May 15, 2003) (citing *Niblo*, 821 F. Supp. at 449). Thus, as Wright and Miller states:

> [T]here appears to be general judicial agreement, as reflected in the
> extensive case law on the subject, that they should be denied unless
> the challenged allegations have no possible relation or logical
> connection to the subject matter of the controversy and may cause
> some form of significant prejudice to one or more of the parties to
> the action.

Wright & Miller, *supra*, at § 1382; *see also Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d
at 868); *Global Adr*, 2003 WL 21146696, at *1 (citing *Niblo*, 821 F. Supp. at 449). *But see Frank
v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *reconsideration granted in part on
other grounds*, No. 11-871, 2012 WL 1230736 (E.D. La. Apr. 12, 2012) ("A motion to strike
should be granted only when 'the allegations are prejudicial to the defendant or immaterial to the
lawsuit.' " (quoting *Harris v. USA Ins. Companies*, No. 11-201, 2011 WL 3841869, at *1 (E.D.
La. Aug. 30, 2011)(quoting *Johnson v. Harvey*, No. 96-3438, 1998 WL 596745, at *7 (E.D. La.
Sept. 8, 1998)))). This standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high
bar," *Global Adr*, 2003 WL 21146696, at *1.

" '[S]candalous' matter is that which improperly casts a derogatory light on someone, most
typically on a party to the action." Wright & Miller, *supra*, at § 1382. Critically, "[i]t is not enough
that the matter offends the sensibilities of the objecting party if the challenged allegations describe
acts or events that are relevant to the action." *Id.* So, for example, "courts have permitted
allegations to remain in the pleadings when they supported and were relevant to a claim for
punitive damages." *Id.*

With respect to the procedural aspects of motions to strike, "[a] motion to strike must
comply with the requirement in Rule 7(b) that motions state with particularity the grounds therefor
and set forth the nature of relief or type of order sought." *Id.* at § 1380. "All well-pleaded facts are
taken as admitted on a motion to strike but conclusions of law or conclusions drawn from the facts
do not have to be treated in that fashion by the district judge." *Id.* "The district court also should

26

refrain from becoming enmeshed in the merits of the action or the legal sufficiency of the pleadings, although this may be difficult to prevent when the relevance or materiality of the challenged allegations is in issue on the motion." *Id.* at § 1382. "If the court grants a motion to strike redundant, immaterial, impertinent, or scandalous material, its order should delineate the matter to be eliminated with some care so as to avoid the excision of unobjectionable allegations and to prevent unnecessary controversy over the scope of the order." *Id.* Thus, "[i]f the district court determines that certain references in a pleading are prejudicial, only those references and not the entire paragraphs containing them should be stricken." *Id.* at § 1380.

"[T]he action of striking a pleading should be sparingly used by the court[.]" *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). "[S]triking a portion of a pleading is a drastic remedy[.]" *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868). Consequently, "motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *Id.* "Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." Wright & Miller, *supra*, at § 1382.

### C. Analysis

Having carefully considered the matter, the Court will deny the *Motion* on this issue. While Plaintiffs' claim that Landry and Wycoskie murdered Queen is certainly provocative, the Court cannot conclude that these allegations have "no possible relation to the controversy" so as to strike them as "scandalous" under Rule 12(f). *Coney*, 689 F.3d at 379. Again, "[i]t is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action." Wright & Miller, *supra*, at § 1382. If courts allow such allegations "when they supported and were relevant to a claim for punitive damages," *id.*, then

such allegations should certainly not be stricken here; as Plaintiffs argue, the allegations against Landry and Wycoskie go to the very heart of the controversy.

Thus, given the facts (1) that this relief "should be sparingly used by the court," *Coney*, 689 F.3d at 379 (citations omitted); (2) that it is a "drastic remedy," with such motions "viewed with disfavor and . . . infrequently granted," *Niblo*, 821 F. Supp. at 449; (3) that the standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high bar," *Global Adr*, 2003 WL 21146696, at *1, and (4) that "[a]ny doubt . . . should be resolved in favor of the non-moving party," Wright & Miller, *supra*, at § 1382, the Court finds that the Municipal Defendants have clearly failed to demonstrate that the Court should strike those parts of the *Amended Petition* claiming that Landry and Wycoskie killed Queen.  This part of the *Motion* is thus denied.

## V.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Rule 12(c) Motion for Judgment on the Pleadings or, Alternatively, Rule 12(e) Motion for a More Definite Statement and Motion to Strike Pursuant to Rule 12(f)* (Doc. 16) filed by defendants, the City of Port Allen, former Officer Briant Landry in his official capacity only, and former Officer Tiffeny Robertson Wycoskie in her official capacity only, is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 13, 2022.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**