UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TARA SNEARL, ET AL.                                  CIVIL ACTION

VERSUS                                               NO. 21-455-JWD-RLB

CITY OF PORT ALLEN, ET AL.

## ORDER

Before the Court is Sheriff Jeff Bergeron's Motion to Quash. (R. Doc. 98). The motion is opposed. (R. Doc. 99). Sheriff Bergeron filed a Reply. (R. Doc. 102).

The Court set an evidentiary hearing to address the following issues: (1) whether federal common law or state law determines the existence and scope of the asserted privilege, and (2) whether, under the applicable factors, the asserted privilege applies to the documents sought by Plaintiffs' subpoena. (R. Doc. 103).

After the hearing, Sheriff Bergeron submitted a post-hearing memorandum and Reply (R. Docs. 109, 112) and Plaintiffs submitted a post-hearing memorandum (R. Doc. 110).

Having considered the record and the arguments of the parties, the Court will grant the Motion to Quash in its entirety.

## I.    Background

Tara Snearl and A.T. (collectively, "Plaintiffs"), the mother and minor daughter of the deceased Fartrell Queen ("Queen"), bring this wrongful death action against Officer Briant Landry ("Landry"), Officer Tifffeny Wycoskie ("Wycoskie"), and the City of Port Allen pursuant to 42 U.S.C. § 1983 and state law. (*See* R. Doc. 1-1; R. Doc. 68).

In the operative Second Amended Complaint, Plaintiffs allege that on November 2, 2017, gunshots were heard at Queen's house at 5:00 a.m., and then, after calls were made to 911, Landry and Wycoskie, two former officers of the Port Allen Police Department ("PAPD"), as

well as unidentified officers of the West Baton Rouge Sheriff's Office ("WBRSO"), arrived at Queen's home. (R. Doc. 68 at 3). Plaintiffs allege, among other things, that Landry then "shot and killed Queen," and the "Defendants Landry, Wycoskie, the City of Port Allen, and other unnamed individuals have been attempting to conceal Defendant Landry's homicidal act since the date of Queen's death." (R. Doc. 68 at 3). In support of a claim of spoliation of evidence, Plaintiffs alleges that "Defendant Landry intentionally caused part of his bodycam video to be destroyed or otherwise made unavailable to Plaintiffs for the purpose of concealing his firing of the 'kill shot' into Queen's head" and "subsequently sold the weapon he used to fire the kill shot to prevent a match between the weapon and the bullet and/or cartridge case." (R. Doc. 68 at 13-14).

After completing an *in camera* review of documents and information sought from the City of Port Allen, the Court ordered the production of Landry and Wycoskie's bodycam video from the date of the incident and ballistic reports concerning the incident (redacted to remove the names of any witnesses and suspects) for review by Plaintiffs' former counsel and then by Plaintiffs. (R. Docs. 47, 48). After viewing the videos, Plaintiffs' former counsel sought to withdraw as counsel. (R. Doc. 49). Plaintiffs then obtained new counsel to enroll on their behalf. (*See* R. Docs. 64, 80).

On June 27, 2024, the parties filed a Joint Motion to Stay Proceedings. (R. Doc. 90). The district judge granted the motion, staying the action and administratively closing the case. (R. Doc. 92).

On August 6, 2024, Plaintiffs filed an unopposed motion to lift the stay, and reopen the case, for the limited purpose of serving a subpoena on WBRSO. (R. Doc. 94). The district judge granted the motion and lifted the stay for this limited purpose. (R. Doc. 97).

2

On August 27, 2024, Plaintiffs served the Rule 45 subpoena at issue on the WBRSO,

seeking the following documents and information:

1. all police reports, investigation reports, and internal affair reports relating to the subject matter of this litigation;

2. all dispatch calls to and from the Port Allen Police Department (PAPD) on November 2, 2017;

3. all 911 calls relating to the subject matter of this litigation;

4. all radio and telephone communications between Bryant Landry ("Landry") and PAPD and Tiffany Robertson Wycoskie ("Wycoskie") and PAPD from November 2, 2017, relating to the subject matter of this litigation;

5. all reports of Landry firing his police-issued weapons prior to November 2, 2017;

6. all written, audio-recorded, and video-recorded witness statements relating to the subject matter of this litigation;

7. any and all bodycam video from any and all officers on the scene at Queen's house on November 2, 2017;

8. a list of all PAPD and WBRSO personnel on scene at Queen's house on November 2, 2017;

9. all building-surveillance video obtained in the course of any investigation of the incident conducted by or on behalf of PAPD, WBRSO, and/or 18th Judicial District Attorney Tony Clayton;

10. any and all bullet casings obtained from the crime scene, including not only Queen's house but also Queen's neighbors' houses;

11. any and all logs indicating the chain of custody for these bullet casings; and

12. the contents of the many text messages and voicemails stored in Queen's phone in the days and hours leading up to and following his death.

(R. Doc. 98-3).

On September 10, 2024, Jeff Bergeron, Sheriff of West Baton Rouge Parish ("Sheriff Bergeron"), filed the instant Motion to Quash the subpoena. (R. Doc. 98). In support of the motion, Sheriff Bergeron first asserts the following:

> As a preliminary matter, Mover submits that he does not possess the following items: (1) all radio and *telephone* communications between Briant Landry ("Landry") and PAPD and Tiffany Robertson Wycoskie ("Wycoskie") and PAPD from November 2, 2017, relating to the subject matter of this litigation; (2) all reports of Landry firing his police-issued weapons prior to November 2, 2017; and (3) a list of all PAPD and WBRSO personnel on scene at Queen's house on November 2, 2017. While WBRSO personnel do have copies of bodycam videos, those videos were taken from devices belonging to Port Allen Police Officers, as WBRSO personnel are not equipped with body cameras. In other words, only the Port Allen Defendants can state, with certainty, whether any body camera footage other than the footage previously viewed by Ms. Snearl exists. Plaintiff's request that she be provided with "*any and all bullet casings obtained from the crime scene*" must also be addressed and designated for what it is: unrealistic. Mover cannot hand over and consequently contaminate direct evidence taken from what is believed to be the firearm used to murder Mr. Queen in support of Plaintiffs' pursuit for monetary damages. The bullet casings' chain of custody and the integrity of that evidence must be preserved for the purpose of any future prosecution.

(R. Doc. 98-1 at 3). Plaintiffs do not directly address these assertions in opposing the Motion to Quash.

Sheriff Bergeron further argues that all other documents in "the criminal investigation file" sought by the subpoena are not subject to disclosure in light of the protections provided in Louisiana's Public Record Act, LA. R.S. 44:3(A)(1), which protects from disclosure records pertaining to "any criminal litigation which can be reasonably anticipated." (R. Doc. 98 at 5-9).

In support of a finding that criminal litigation "can be reasonably anticipated" with respect to Queen's death, Sheriff Bergeron submits the declaration of Detective Kenneth Young ("Detective Young"). (R. Doc. 98-4). Detective Young, a criminal investigator with WBRSO, states that he is personally involved in an "ongoing" criminal investigation into the death of Queen being jointly conducted by the WBRSO and PAPD, with the PAPD serving as the

4

"primary investigating agency" regarding Queen's death. (R. Doc. 98-4 at 1). Detective Young further states that "[d]isclosure of the criminal investigation file into Mr. Queen's death could prove harmful to [the] investigatory efforts, as key information that is not publicly known could potentially be disclosed, thereby jeopardizing not only the criminal investigation into this matter, but any potential criminal prosecution brought by the State of Louisiana against Mr. Queen's killer." (R. Doc. 98-4 at 1-2).

In opposition, Plaintiffs argue, among other things, that the protections from public disclosure detailed in La. R.S. 44:3(A)(1) do not apply in this case because Sheriff Bergeron has not established that the there is an active, ongoing, and good-faith homicide investigation, notwithstanding the assertions in Detective Young's declaration. (R. Doc. 99).

In reply, Sheriff Bergeron argues that Detective Young's declaration establishes that there is "reasonably anticipated criminal litigation" notwithstanding Plaintiff's "skepticism" regarding the investigation, and, therefore, the investigative records are protected from disclosure until ten years have elapsed from Queen's death. (R. Doc 102).

On December 11, 2024, the Court held an evidentiary hearing at which Detective Young provided testimony. (R. Doc. 104; *see* R. Doc. 108). Sheriff Bergeron asserts that Detective Young's testimony establishes that "(1) Mr. Queen's death has been classified as a homicide, (2) there is an ongoing investigation into that homicide by both PAPD, as the lead agency, and WBRSO, (3) disclosure of information contained in the investigative file relative to Mr. Queen's murder would jeopardize the investigation, insofar as suspects and independent witnesses have been identified by name and personal identifiers, (4) disclosure of that information could tip those suspects off and/or result in physical harm to those independent witnesses, and (5) Ms. Snearl was previously privy to sensitive case information and that information was made public."

(R. Doc. 109 at 2-3). In contrast, Plaintiffs argue, among other things, that Detective "Young failed to provide any verifiable facts indicating that an arrest or prosecution is forthcoming" and that "[a]n investigation that stalls for years, without any arrests, witness follow-ups, or prosecutorial action, is an investigation in name only." (R. Doc. 110 at 3).

As ordered by the Court, on January 9, 2025, Sheriff Bergeron "provided the court with case reports prepared by PAPD detailing investigative steps that were taken in 2022, 2023, and 2024." (R. Doc. 109 at 3). The Court has reviewed these documents *in camera*. These reports contain significant, more current information about the criminal investigation that is not publicly known. The contents are consistent with Detective Jones' representations and their disclosure could jeopardize not only the criminal investigation into this matter, but any potential criminal prosecution brought by the State of Louisiana.

The Court ordered the parties to submit post-hearing briefs addressing the following two issues: (1) whether federal common law or state law determines the existence and scope of the asserted privilege, and (2) whether, under the applicable factors and in light of the testimony provided by Detective Young, the asserted privilege applies to the documents sought by Plaintiffs' subpoena. (R. Doc. 104). The parties submitted post-hearing briefs as ordered. (*See* R. Docs. 109, 110).

Having considered the arguments of the parties, as well as the evidence presented at the evidentiary hearing and the PAPD reports examined *in camera*, the Court concludes that it is appropriate to quash the subpoena in its entirety.

## II.     Law and Analysis

### A.     Legal Standards

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). The court must limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Rule 26(c)'s "good cause" requirement indicates that the party seeking a protective order has the burden "to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

Rule 45 governs the issuance of subpoenas. "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." Fed. R. Civ. P. 45(d)(1). On timely motion, the court for the district where compliance is required must quash or modify a subpoena that fails to allow a reasonable time to comply or subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A). Subpoenas issued for discovery purposes are subject to the discovery limitations outlined in Rule 26(b). *See Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 596 (E.D. Tex. 2003); 9A Wright & Miller, Federal Practice & Procedure 2d § 2459 ("Of course, the matter sought by the party issuing the subpoena must be reasonably calculated to lead to admissible evidence as is required by the last sentence of Rule 26(b)(1).").

### B.    Information Not in WBRSO's Possession and Physical Evidence

First, the Court will quash the subpoena to the extent it seeks information that is not in WBRSO's possession, including: telephone communications between Landry and PAPD and/or between Wycoskie and PAPD from November 2, 2017 (Category No. 4); (2) all reports of Landry firing his police-issued weapons prior to November 2, 2017 (Category No. 5); bodycam video from officers on the scene at Queen's house on November 2, 2017 (to the extent they are not in WBRSO's possession) (Category No. 7); and a list of all PAPD and WBRSO personnel on scene at Queen's house on November 2, 2017 (Category No. 8). Plaintiffs have raised no argument in support of a finding that this information is in the possession, custody, or control of WBRSO.

Second, the Court will quash the subpoena to the extent it seeks the production of physical evidence, including any and all bullet casings obtained from the crime scene (Category No. 10). The Court agrees with WBRSO that producing such physical evidence would lead to

8

potential contamination and destroy the chain and custody and the integrity of the evidence for the purposes of any future prosecution.

The Court will discuss additional reasons for quashing the subpoena pursuant to the privileges from production discussed below.

### C.    Applicable Law Governing Privilege

This action was removed on the basis that the Court can exercise federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff has raised claims for damages that arise under the federal civil rights statute, 42 U.S.C. § 1983. (R. Doc. 1; *see* R. Docs. 1-1, R. Doc. 68).

Rule 501 of the Federal Rules of Evidence provides the following:

> The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
>
> • the United States Constitution;
> • a federal statute; or
> • rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501; *see Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991) ("When considering a federal claim, federal courts apply federal common law, rather than state law, to determine the existence and scope of a privilege."). "In cases involving federal and state claims, when the requested evidence relates to both the state and federal claims and the privilege rules conflict, courts have generally applied federal privilege law." *Porter v. Dauthier*, No. 14-41-JWD-RLB, 2014 WL 6674468, at *3 (M.D. La. Nov. 25, 2014) (noting the law is unsettled with respect to the application of federal or state law privilege where supplemental state-law claims are also present in federal question cases); *see also Whitfield v. Riley*, No. 09-1877, 2009 WL 10679761

at *3 (E.D. La. Oct. 2009) ("[T]the federal courts generally agree that the federal common law of privilege applies when substantive federal law provides the rule of decision on [a] plaintiff's Section 1983 claims.") (citing Fed. R. Evid. 501 and collecting cases).

Here, Plaintiffs raise both federal claims and state law claims in the Second Amended Complaint. (*See* R. Doc. 68). At the evidentiary hearing, both parties appeared to concede that the federal common law applies to the raised privilege, but nevertheless argued with respect to the factors applicable to both federal and state law.

Having considered the applicable law, the Court finds it appropriate to apply federal common law to the privilege because federal law is the basis for this Court's subject matter jurisdiction. *See* Fed. R. Evid. 501; *Coughlin*, 946 F.2d at 1159. "In cases involving federal and state claims, when the requested evidence relates to both the state and federal claims and the privilege rules conflict, courts have generally applied federal privilege law." *Porter v. Dauthier*, No. 14-41-JWD-RLB, 2014 WL 6674468, at *3 (M.D. La. Nov. 25, 2014) (citing *Pearson v. Miller,* 211 F.3d 57, 66 (3d Cir. 2000) ("The problems associated with the application of two separate privilege rules in the same case are readily apparent, especially where, as here, the evidence in dispute is apparently relevant to both the state and the federal claims. This court has resolved this potential conflict in favor of federal privilege law . . . ."); *Virmani v. Novant Health Inc.*, 259 F.3d 284, 287 n. 3 (4th Cir. 2001) ("We agree with our sister circuits that in a case involving both federal and state law claims, the federal law of privilege applies."); *Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir. 1992) (same); *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies."); *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (where evidence is relevant to both federal and state claims, federal

privilege law applies); *Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1061 & n. 3 (7th Cir. 1981) (same).

That said, the Court has also considered the application of the privilege originally asserted under Louisiana law. *See Chastant v. Prudential Ins. Co. of Am.*, No. 11-626, 2011 WL 4007863, at *2 (W.D. La. Sept. 8, 2011) (applying La. R.S. 44:3 in diversity action, but considering applicable factors with respect to the federal common law privilege); *see also Coughlin*, 946 F.2d at 1159-60 ("Louisiana law creates a similar privilege" to the federal common law "qualified privilege protecting investigative files in an ongoing criminal investigation "); *see also Day v. CHSV Fairway View, LLC,* No. 21-465-JWD-RLB, 2022 WL 4239061, at *3 (M.D. La. Sept. 14, 2022) (in applying state law, concluding that the Court need not determine whether La. R.S. 44:3(A)(1) strictly provides a "privilege against subpoenas issued to law enforcement agencies in civil proceedings" because it was "sufficient for the Court to find that the discovery sought is a 'protected matter' under the statute and relevant jurisprudence.").

As discussed below, the Court would reach the same result applying the factors applicable to the federal common law privilege and the factors applicable to the Louisiana statutory privilege.

### D.    The Federal Law Enforcement Privilege

When applying the federal "law enforcement privilege," the Fifth Circuit has directed courts "to consider the ten factors articulated in [*Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973)] in balancing the government's interest in confidentiality against the litigant's need for the documents." *Coughlin*, 946 F.2d at 1160. The *Frankenhauser* test requires weighing the following ten factors:

(1) the extent to which disclosure will thwart governmental processes by
discouraging citizens from giving the government information; (2) the impact
upon persons who have given information of having their identities disclosed; (3)
the degree to which governmental self-evaluation and consequent program
improvement will be chilled by disclosure; (4) whether the information sought is
factual data or evaluative summary; (5) whether the party seeking discovery is an
actual or potential defendant in any criminal proceeding either pending or
reasonably likely to follow from the incident in question; (6) whether the police
investigation has been completed; (7) whether any interdepartmental disciplinary
proceedings have arisen or may arise from the investigation; (8) whether the
plaintiff's suit is non-frivolous and brought in good faith; (9) whether the
information sought is available through other discovery or from other sources;
(10) the importance of the information sought to the plaintiff's case.

*In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570 (5th Cir. Aug. 2, 2006) (citations omitted).

The Fifth Circuit has recognized that "in addition to protecting the identity of a
confidential informant, '[f]ederal common law recognizes a qualified privilege protecting
investigative files in an ongoing criminal investigation.'" *In re U.S. Dep't of Homeland Sec.,* 459
F.3d at 569 (quoting *Coughlin*, 946 F.2d at 1159). "Like other circuits using the law enforcement
moniker, the purpose of the [federal law enforcement] privilege in the Fifth Circuit is to protect
from release documents relating to an ongoing criminal investigation." *In re U.S. Dep't of
Homeland Sec.*, 459 F.3d 565, 569 n. 2 (5th Cir. 2006). "[H]owever it is labeled, a privilege
exists to protect government documents relating to an ongoing criminal investigation." *Id*.

Having considered the *Frankenhauser* factors, the Court concludes that the federal law
enforcement privilege applies to the information sought in the subpoena, which all pertain to an
ongoing criminal investigation.

The first and second factors concern confidential informants, weighing the extent to
which disclosure of the sought material will thwart governmental processes by discouraging
citizens from giving the government information and the impact upon persons who have given
information of having their identities disclosed.

Here, Detective Young testified that he has interviewed at least six witnesses in connection with the criminal investigation, the most recent occurring about a year ago. (R. Doc. 108 at 26). Detective Young further testified that the investigative file contains the names and personal details of independent witnesses who are not suspects, such as their dates of birth, addresses, criminal histories, and Social Security numbers. (R. Doc. 108 at 18). Detective Young testified that the disclosure of the names and personal details of the criminal suspects involved with this investigation would jeopardize the investigation into Queen's death. (R. Doc. 108 at 18). Detective Young further testified that disclosure would discourage voluntary witnesses from coming to the government with additional information out of fear for their own safety, especially in cases, like the present, of violent crime where the suspect is still at large. (R. Doc. 108 at 18).

In turn, Plaintiffs argue that the identities of any confidential informants could be redacted to allow compliance with the subpoena without imposing any risks on the confidential informants. (R. Doc. 110 at 5-6). Consistent with this argument, Detective Young testified that identifying information contained in the investigative file could be redacted if needed. (R. Doc. 108 at 29).

In the context of applying the law enforcement privilege solely to confidential informants, the U.S. Supreme Court has stated that "where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." *Roviaro v. United States*, 353 U.S. 53, 60 (U.S. 1957); *see also Coughlin*, 946 F.2d at 1159-60 ("Federal common law recognizes a qualified privilege protecting investigative files in an ongoing criminal investigation or information which would reveal the identity of confidential informants, although if all information indicating the identity of an informant can be eliminated by excision, the document is discoverable.").

Accordingly, Sheriff Bergeron's substantial interest in protecting the identity of any confidential informants may be addressed through redactions, assuming that the investigative file is not otherwise subject to the privilege. Thus, the first factor, read in isolation, would weigh in favor of disclosure. But the second factor considers the degree to which disclosure would generally thwart law enforcement processes. The production of the ongoing investigative file regarding the active homicide investigation into Queen's death would intolerably compromise the government's ability to protect the safety of its officers and the public. The release of the ongoing criminal investigation file may result in information reaching potential suspects, which would place law enforcement officers and the public at risk, and provide suspects with the opportunity to avoid arrest. For these reasons, the second factor weighs heavily against disclosure. *See Clark v. Louisiana*, No. 00-956-JJB-RLB, 2014 WL 5586416, *1 (M.D. La. Nov. 3, 2014) (finding that "written policies and procedures in place for addressing and responding to the occurrence of an escape attempt, hostage incident or riot" were protected under the *Frankenhauser* test given, among other things, "the gravity of the danger presented to prison security officers when they are faced with an escape attempt, hostage-taking, riot or other dangerous and highly charged incident within the prison context.").

The third factor considers the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure of the investigatory file. Sheriff Bergeron argues that "[t]he third factor . . . is not applicable to this matter[.]" (R. Doc. 109 at 5). Plaintiffs note that Detective Young did not provide testimony regarding any departmental review or self-evaluation. (R. Doc. 110 at 7). The absence of a governmental self-evaluation plan weighs in favor of disclosure. *See Tuite v. Henry,* 181 F.R.D. 175, 180 (D.D.C. July 31, 1998).

The fourth factor considers whether the information sought is factual data or evaluative summary. Plaintiffs argue the requested information is purely factual. (R. Doc. 110 at 7). In contrast, Defendant states that "the information sought . . . is a hybrid of factual data and an evaluative summary of that data in terms of law enforcement's efforts at connecting the dots between what factual information has been discovered and the course of the investigation itself." (R. Doc. 109 at 5).

Evaluative summary is protected because "disclosure would have a chilling effect on the ability of police administrators to obtain full and candid reporting from their officers." *Frankenhauser*, 59 F.R.D. 339 at 344. To determine whether information is factual data or evaluative summary. Courts may conduct an *in camera* review of the information to be disclosed. *Id*. at 346.

The Court has conducted an *in camera* review of case reports prepared by PAPD detailing investigative steps that were taken in 2022, 2023, and 2024. The Court concludes that this information contained within the investigative file is a hybrid of factual data and evaluative summary of that data. As the information sought is not purely factual, disclosure would have a "chilling effect on the ability of police administrators to obtain full and candid reporting from their officers." *Frankenhauser,* 59 F.R.D. 339 at 346. The fourth factor weighs against disclosure.

The fifth factor asks whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question. Here, Plaintiffs are not criminal defendants. There are no pending or anticipated prosecution against them. The fifth factor weighs in favor of disclosure.

The sixth factor concerns whether the police investigation has been completed. As stated above, the Court has conducted an *in camera* review of information within the investigative file. Based on this review, the Court is satisfied that there is an open and ongoing investigation into Queen's death. Accordingly, the sixth factor weighs against disclosure.

The seventh factor asks whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation. Neither party asserts that disciplinary proceedings have arisen from the investigation. (R. Doc. 109 at 5; R. Doc. 110 at 8). There is no evidence that any such proceeding may arise from the investigation. Accordingly, the seventh factor weighs in favor of disclosure.

The eighth factor considers whether the plaintiff's suit is non-frivolous and brought in good faith. Given the information, including body cam videos, reviewed by the Court *in camera*, there are serious questions regarding the validity of Plaintiffs' claim that Landry shot and killed Queen as alleged. (*See* R. Doc. 68 at 3). Certain aspects of Plaintiffs' prior claims have been completely refuted and subsequently withdrawn. This factor is neutral at best.

The ninth factor asks whether the information sought is available through other discovery or from other sources. Plaintiffs claim that WBRSO is the sole custodian of the investigative file and therefore has exclusive control over its contents. (R. Doc. 110 at 9). Sheriff Bergeron points out that the investigate file could be obtained from the PAPD, which would also have in its possession, custody, or control specific information with respect to PAPD officers that are not in the possession, custody, or control of WBRSO. (R. Doc. 109 at 6). Sheriff Bergeron also argues that the sought information could have been obtained directly from Landry and Wycoskie (and other third-party witnesses) through depositions prior to seeking the investigative file. (R. Doc. 109 at 6).

This action was removed in 2021. (R. Doc. 1). It is unclear what discovery has been directly sought form Landry and Wycoskie in this action, including through depositions and written discovery. Regardless, there is no dispute that the investigative file can be obtained, in whole or in part, solely through WBRSO or the PAPD. There is also no dispute that this same privilege analysis would apply to any other law enforcement agency and therefore, even if in the possession of other sources, it would be no easier to obtain from that source. This factor is neutral.

Finally, the tenth factor weighs the importance of the information sought to the plaintiff's case. Here, Plaintiffs contend the requested investigative file is "not secondary or merely supportive of other evidence[,]" but rather "the investigative file is essential to determining whether law enforcement did in fact improperly discharge its duties or neglect critical aspects of the case." (R. Doc. 110 at 9). In opposition, Sheriff Bergeron states that the "[s]pecific items pertaining to the investigation itself – including, but not limited to, all police reports and investigative reports pertaining to Mr. Queen's murder or 'logs indicating the chain of custody' for bullet casings found at the scene of the murder – are presently wholly irrelevant to Plaintiff's theory of the case." (R. Doc. 109 at 7).While some portions of the file may have nothing to do with the Plaintiffs' claims, there can be no serious dispute that portions of the investigative file is important to Plaintiff's case and relevant to Plaintiff's claims of a conspiracy and cover-up. Accordingly, this factor weighs in favor of disclosure.

Having considered the appropriate factors, the Court concludes that the WBRSO's substantial interest in maintaining the integrity of the ongoing investigation into Queen's death outweighs Plaintiff's interests in the sought investigative file. While some of the *Frankenhauser*

factors weigh in favor of disclosure, the Court concludes that Plaintiff's interests in the investigative file must yield to the WBRSO's substantial interest in non-disclosure.

**E.    Louisiana's Statutory Privilege Against Disclosure, La. R.S. 44:3(A)(1)**[1]

As discussed above, the information sought by Plaintiffs is protected by disclosure pursuant to the federal law enforcement privilege. That said, the Court would reach the same conclusion under Louisiana Public Records Act which provides, in pertinent part, the following:

> A. Nothing in this Chapter shall be construed to require disclosures of records, or the information contained therein, held by the offices of the attorney general, district attorneys, sheriffs, police departments, Department of Public Safety and Corrections, marshals, investigators, public health investigators, correctional agencies, communications districts, intelligence agencies, Council on Peace Officer Standards and Training, Louisiana Commission on Law Enforcement and Administration of Criminal Justice, or publicly owned water districts of the state, which records are:
>
> > (1) Records pertaining to pending criminal litigation or **any criminal litigation which can be reasonably anticipated**, until such litigation has been finally adjudicated or otherwise settled, **except as otherwise provided in Subsection F of this Section**.

La. R.S. 44:3(A)(1) (emphasis added). In turn, Section F provides that "after a period of ten years has lapsed from the date of death of a person by other than natural causes," immediate family members of the deceased may obtain access to the otherwise protected records. *See* La. R.S. 44:3(F).

With respect to the protection provided in La. R.S. 44:3(A)(1), the Louisiana Supreme Court has set forth a similar multifactor test for determining whether a criminal prosecution is

---

[1] Louisiana law requires a "contradictory hearing" to determine whether and to what extent La. R.S. 44:3(A)(1) is applicable. *In re Matter Under Investigation*, 15 So.3d at 991-92 ("[A] thoughtful determination must be made following a contradictory hearing wherein there is an opportunity for cross examination and presentation of evidence to contradict a claim of privilege."). To the extent Louisiana law would be applicable, the evidentiary hearing held on December 11, 2024 would meet this requirement.

"reasonably anticipated" and, therefore, records pertaining to the ongoing criminal investigation are protected from production under state law:

> [T]he determination of whether criminal litigation is reasonably anticipated within the meaning of La. R.S. 44:3 must be made on a case-by-case basis in the context of a contradictory hearing wherein the opportunity to present evidence and cross-examine witnesses is present. The determination must rest on more than an assertion by the prosecutorial authority that criminal litigation is or is not reasonably anticipated. Were the determination based solely on the testimony of the prosecutor, inconsistencies and caprice could enter the determination of whether the Public Records Act requires disclosure of the records at issue. The prosecutorial authority could change its mind, a new prosecutorial administration could enter office, new evidence could be discovered, a witness could come forward, or an absconded defendant could be found. The determination of whether criminal litigation is reasonably anticipated is subject to factors both within the prosecutorial authority's discretion and outside of its control.

> We therefore find that a court's determination of whether criminal litigation is reasonably anticipated pursuant to La. R.S. 44:3(A)(1) must be guided by objective factors. These factors must serve the dual purpose of protecting the public's right to know and safeguarding a prosecutorial authority's ability to preserve the integrity of an investigatory file when criminal prosecution is reasonably anticipated, which is the purpose of the limited exemption provided by the statute at issue. The determination should take into account, among other things the court finds relevant: [1] whether criminal litigation may still be initiated given the prescriptive period of the offense to be charged; [2] the temporal and procedural posture of each case; [3] whether criminal litigation has been finally adjudicated or otherwise settled; [4] the assertion of the prosecutorial authority as to its intent or lack thereof to initiate criminal litigation; [5] whether the prosecutorial authority has taken objective, positive and verifiable steps to preserve its ability to initiate criminal litigation, including, but not limited to, preserving evidence, maintaining contact with witnesses, and continuing an investigation; [6] the time it would take to appropriately investigate and try an offense; [7] the prosecutor's inherent authority to determine whom, when and how he will prosecute, La.C.Cr.P. art. 61; [8] the severity of the crime; [9] the availability of witnesses, victims and defendants; [10] the spoilation of evidence; [11] the reasonable likelihood that a missing witness or an absconded defendant might be found; and [12] the reasonable likelihood that additional witnesses might be willing to come forward with the passage of time. As always, the burden of proving that the record is not subject to inspection, copying, or reproduction by a member of the public rests with the custodian. La. R.S. 44:31(3).

*In re Matter Under Investigation*,15 So.3d 972, 991-993. (La. 2009) (brackets inserted);[2] *see Does v. Foti*, 81 So. 3d 101, 109 (La. App. 1st Cir. 2011) (addressing all twelve factors as evaluated by trial judge on remand), *writ denied*, 84 So. 3d 537 (La. 2012).

The first factor considers whether criminal litigation may still be initiated given the applicable prescriptive period. Detective Young testified that Queen's death has been classified as a second-degree murder. (R. Doc. 108 at 11). Under Louisiana law, second-degree murder is punishable by life in prison. La. R.S. 14:30.1. In Louisiana, there is no prescriptive period for crimes punishable by life in prison. La. Code Crim. Proc. art. 571. This factor weighs against disclosure.

The second factor considers the temporal and procedural posture of the case. Queen was found dead on November 2, 2017. Detective Young testified that he was personally involved with a joint investigation commenced on the same date with the PAPD. (R. Doc. 108 at 10). This litigation was filed in state court about one year later and was removed in 2021. (R. Doc. 1). Detective Young further testified that there are currently active suspects in the investigation of Queen's death. (R. Doc. 108 at 16). The Court's *in camera* review of the steps taken in 2022, 2023, and 2024 support a finding that the criminal investigation is ongoing. This factor weighs against disclosure.

The third factor concerns whether criminal litigation has been finally adjudicated or otherwise settled. There has been no criminal litigation regarding Queen's death. This factor weighs against disclosure.

---

[2] The Louisiana Supreme Court further suggested that the ten-year period provided in La. R.S. 44:3(F) is a legislative recognition that criminal litigation may, in certain situations, be "reasonably anticipated" for up to ten years in cases involving unnatural deaths. *See In re Matter Under Investigation*, 15 So.3d 972, 992 (La. 2009) ("Because the legislature recognized the great length of time in which criminal litigation can be reasonably anticipated in some cases, it provided a means by which the information contained in the investigative file could be obtained after the passage of ten years by certain members of the public whose right to access the information predominates; namely, the immediately family of the decedent.").

The fourth factor considers whether prosecutorial authority has asserted its intent or lack thereof to initiate criminal litigation. When considering this factor, a court should consider whether the prosecutorial authority has taken objective, positive, and verifiable steps to preserve its ability to initiate criminal litigation. *Does v. Foti,* 81 So.3d 101, 110 (La. 1st Cir. 2011). Sheriff Bergeron argues that while the State of Louisiana has not affirmatively asserted its intent to institute criminal litigation through seeking an indictment, there is no evidence it has asserted an intent not to in the future. (R. Doc. 109 at 9). At the evidentiary hearing, when asked how long it usually takes for the typical homicide investigation to go from commencement to indictment, Detective Young testified that he has seen investigations with arrests on the first night, sometimes years later, and sometimes never. (R. Doc 108 at 33). Plaintiffs note that "[n]o arrests have been made, no grand jury has been convened, and no prosecutorial action has been taken[.]" (R. Doc. 110 at 12). Nevertheless, the Court's *in camera* review of documents, as well as the testimony of Detective Young, support a finding that there have been significant recent developments in the investigation that may lead to an arrest and prosecution. This factor is neutral.

The sixth factor considers the time it would take to appropriately investigate and try an offense. As discussed above, homicides can take years to investigate. This factor is neutral.

The seventh factor, the prosecutor's inherent authority to determine whom, when and how he will prosecute, is largely irrelevant given the ongoing criminal investigation. This factor is neutral.

The eight factor concerns considers the severity of the alleged crime. This investigation involves a homicide, and potentially a charge of second-degree murder. This factor weighs against disclosure.

The ninth factor considers the availability of witnesses and defendants. The Court's *in camera* review has verified the availability of witnesses and, potentially, criminal defendants. This factor weighs against disclosure.

The tenth factor considers the spoliation of evidence. Notwithstanding Plaintiffs' claim of spoliation with respect to body cam video, there is no evidence that the investigative file (including information already reviewed by the Court *in camera*) is at risk of spoliation. This factor weighs against disclosure.

The eleventh factor inquiries into the reasonable likelihood that a missing witness or an absconded defendant might be found. The Court is unaware of any missing witnesses or absconded suspects. This factor is neutral.

The twelfth and final factor assess the reasonable likelihood that additional witnesses might be willing to come forward with the passage of time. As discussed above, as the recent significant developments in the investigation are further pursued, there is a reasonable likelihood that new witnesses or suspects will be identified in the future.

Given the foregoing, and to the extent Louisiana law is applicable, the Court finds that the relevant factors weigh against disclosure of the investigative file as a whole. *See In re Matter Under Investigation*, 15 So.3d at 991 ("Everything in the file can be said to pertain to criminal litigation.").

## III.  Conclusion

Based on the foregoing,

**IT IS ORDERED** that Sheriff Jeff Bergeron's Motion to Quash (R. Doc. 98) is **GRANTED.** The parties shall bear their own costs.

**IT IS FURTHER ORDERED** that the parties shall notify the undersigned upon any material change in circumstances regarding the investigation at issue. This would include the expiration of the ten year period under La. R.S. 44:3(F).

**IT IS FURTHER ORDERED** that this action shall remain administratively closed.

Signed in Baton Rouge, Louisiana, on April 23, 2025.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**